(99 App. Div. 175)

### COOLIDGE v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. December 9, 1904.)

1. BRIDGE—COLLAPSE—DEATH—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

In an action for the death of a traveler killed in the collapse of a temporary bridge over a street excavation, erected pursuant to a permit issued by the city, it appeared that the street was reasonably safe for ordinary use, but that the bridge was borne down by the weight of an unusual number of people passing to view a parade, which was augmented by the closing of department stores in the vicinity at the same time. The police department of the city was notified by one of its officers the day before the parade that the bridge would be unsafe if a large crowd of people were allowed to gather on it, and, having no facilities

for strengthening the bridge, the department placed officers on the bridge the day of the parade to keep the people moving and prevent them from gathering and remaining on the bridge. The police officers who were on the bridge regulating the traffic went down with the bridge. *Held* insufficient to show that the death was due to negligence on the part of the city.

**2. SAME—JURY QUESTION.**

Whether the subcontractors who erected the bridge were guilty of negligence in its construction was, under the evidence, a question for the jury.

**3. SAME—IDENTITY OF DECEASED AS TRAVELER ON STREET.**

Whether plaintiff's decedent was a traveler on the street and went down on the bridge at the time of the collapse, was also, under the evidence, a question for the jury.

**4. SAME—CONTRIBUTORY NEGLIGENCE.**

There can be no contributory negligence in the use of a bridge over a street excavation by one traveling on the street, though there was an unusual number of people passing on the street and over the bridge at the time to view a parade, as any one walking along the sidewalk, and required to use the bridge in consequence of the parade, would be justified in assuming that the persons building the bridge had performed their duty and built the bridge so that it was reasonably safe for use.

**5. SAME—MODEL—EVIDENCE—ADMISSIBILITY.**

Plaintiff produced what purported to be a model of the bridge, and called a witness who testified that he had constructed the model and as to its construction. The model represented three uprights on which rested three needles supporting the stringers, on which was the platform of the bridge. Another witness testified that it was a correct representation, to the best of his recollection, of the general construction work of the bridge at the time he saw it, which was before the collapse. There was evidence tending to show that there were four uprights instead of three, and other evidence that the model was a substantial reproduction of the bridge. *Held*, that the model was admissible in evidence.

**6. SAME—JURY QUESTION.**

Whether a model of the bridge introduced in evidence was a correct representation of the bridge was, under the evidence, a question for the jury.

**7. SAME—VERDICT—EXCESSIVENESS.**

Deceased was 37 years old, and left a wife and four children, the oldest about 4½ years of age, and the youngest 3½ months. The evidence was indefinite as to the amount deceased earned. The plaintiff, his wife, testified that she received from him from $20 to $25 a week for herself and children. *Held*, that a verdict for $22,000 was excessive.

Van Brunt, P. J., and Laughlin, J., dissenting in part.

Appeal from Trial Term, New York County.

Action by Mary E. Coolidge, administratrix of the estate of Erwin L. Coolidge, deceased, against the city of New York and others. From a judgment for plaintiff and an order denying a motion for a new trial, defendants appeal. Reversed in part.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Terence Farley, for appellant the City of New York.

A. A. Spear, for appellants Miller and Holme.

William B. Waring, for respondent.

INGRAHAM, J. It appears that one Henry Corn was the owner of certain property upon the northwest corner of Eighteenth

street and Fifth avenue, in the city of New York; that he made a contract with the defendant Cowen to erect a building upon said property; that Cowen made a subcontract with the defendants Miller and Holme to provide the materials and perform the labor for the necessary shoring, sheath piling, and construction of a temporary bridge or sidewalk for use during the construction of the building; that Corn, the owner of the property, applied to the commissioner of public works of the city of New York for a license to construct a vault extending. into Fifth. avenue, and obtained such permit or license upon payment to the city of the sum of $5,886; and that this license contained a permit which authorized Corn to erect a bridge not to exceed five feet in height above the sidewalk, and extending no greater distance than the length of the excavation for the vault authorized by the permit. There is no question but that this permit was valid and authorized by the charter and ordinances of the city of New York.

Corn made the contract with the defendant Cowen for the erection of the building, which included the erection of the necessary bridge over the sidewalk during the construction of the vault. Cowen made a subcontract with the defendants Miller and Holme, by which Miller and Holme undertook to provide all the materials and perform all the work mentioned in the specifications annexed to the contract and shown by the drawings prepared by the architect for the shoring of the adjoining buildings, sheath piling of outside line of property, including vaults, bridges over sidewalk vaults, and material, platform over sidewalks for buildings to be erected upon the premises; the work to be done under the direction of the architect, and for which Miller and Holme were to receive $4,400. In pursuance of this contract the defendants Miller and Holme erected a bridge over the excavation under the sidewalk and the portion of the street necessary to construct the vault authorized by the permit from the city, and the bridge was in use for two or three weeks after it was completed before the 27th day of May, 1902. On that day there was a parade up Fifth avenue. A large number of people were upon this bridge while the parade was passing, when a portion of the bridge suddenly collapsed, throwing a number of the people that were on it into the excavation. A police officer who was on duty on this bridge testified that he went down, when the bridge gave way into the excavation; that he fell towards Sixth avenue, landing about 12 or 14 feet west of where he was standing before the bridge.fell; that he fell upon a large beam, and that he noticed under it the body of a man; that he, with others, took up the beam, and took up the body of this man, whose head had been crushed by the beam; that the man was then dead; that just before the accident the witness, who was standing on the bridge, felt the bridge shake; that the officers had been warned to keep the people moving or the bridge might fall into the cellar, and they were doing the best they could to keep the bridge from being crowded; that just before this accident there was a large number of people who had come from department stores on Sixth avenue; that these people, added to those in the street, caused

many more people on the bridge than before, and it was when the increased number of people came that the officer first noticed that the bridge was shaking.

This bridge was constructed of timber, under the immediate direction of the defendant Miller, who had been engaged in the construction of bridges of this kind for about 30 years. There was evidence tending to show that when a good many people were passing over the bridge there was a lateral swaying; that there were no side supports to the three upright beams upon which the crosspieces which sustained the bridge rested, no knee braces or angle braces to support the timbers used in the construction of the bridge, simply a crosspiece resting upon an upright. There was also evidence to show that early in the morning of the 27th of May, the day of the accident, a police officer who was on duty at this point reported to his sergeant of police that this bridge was in an unsafe condition should a crowd collect to witness the parade on the 27th. This report was received by the sergeant of police after midnight. There was evidence of an expert who, in answer to a hypothetical question, testified that the cause of the falling of the bridge was the lack of lateral or transverse bracing; that there was nothing to protect this bridge, while swaying under the weight of a moving crowd, from starting in this direction.

At the close of the testimony the complaint as to the defendant Cowen was dismissed by consent of the plaintiff, whereupon the defendants the city of New York and Miller and Holme severally moved to dismiss the complaint. These motions were denied, and the defendants excepted. On the part of the defendants, there was evidence as to the construction of the bridge and the braces to prevent lateral motion. The defendant under whose direction the bridge was constructed was an expert bridge builder, having been engaged in work of this kind for upwards of 30 years. Competent foremen were employed, who had also been engaged in work of this kind for many years. There was also evidence that on the morning of the accident a builder was requested to inspect the bridge. He made an examination, and testified that he found the bridge in fair condition for that purpose; that he was present when the bridge collapsed; that immediately before the collapse of the bridge he saw it begin to sway, and immediately after came the crash. This witness testified that he had been in the building business 25 years, and the braces he had described, which were employed in strengthening this bridge, were sufficient to make a strong substantial structure. It was also proved that, before the crowd gathered on Fifth avenue to see the parade, some of the defendants erected barricades across the approaches to this bridge to prevent its being used, but that subsequently they were torn away, and the bridge was crowded with people constantly moving under the direction of the police.

A police sergeant, when he ascertained the report of the officer on post, instructed the police officer to notify the person in charge of this bridge that a report had been made that this bridge was unsafe, and subsequently the officer reported to the sergeant that

he had notified the foreman of the defendant Cowen that the bridge was unsafe; that this foreman and another person had made an examination of the bridge and found that it was sound. The officer who was instructed to inform the person in charge of the bridge as to its condition testified that he saw the defendant Cowen's foreman, and informed him that the bridge was unsafe; that the officer examined the bridge, and it seemed to be strong and safe. Police officers in charge of this locality testified to the difficulty they had in keeping this bridge from being crowded with persons desiring to see the parade; that the crowd had greatly increased just before the collapse, and the people were then forcing their way up on the steps on the Eighteenth street end of the bridge; that prior to the collapse none of the officers saw any indication of danger, and several of them were on the bridge when it fell, and went down with it. A building inspector attached to the department of buildings also testified that he inspected this bridge during and subsequent to its construction; that he found the bridge constructed of good seasoned lumber, with proper side railing, braces, and steps.

Upon this record there are two questions presented, which are based upon substantially different legal propositions. The first is whether there is evidence to justify a finding that the city is liable, and the second, as to whether the contractors who built the bridge are liable. I do not think that it can be fairly said that there is any evidence to sustain a finding that this bridge was unsafe for the ordinary street use of Fifth avenue in this locality. The evidence is undisputed that it was used for upwards of two weeks prior to the accident, and subsequently was reconstructed in the same way as originally constructed, and continued in use until the building was completed. The conditions that existed on the day of the accident were most unusual. In consequence of a parade, large crowds had assembled on the avenue along the line of parade, which crowds were largely augmented by the closing of the department stores in the vicinity just prior to the collapse. They gathered upon this bridge, and it was undoubtedly because of the extraordinary strain placed upon the bridge because of this crowd of people that it collapsed. Could the officers of the city, responsible for the condition of this street, be chargeable with notice that such a condition would exist? To hold the city of New York liable, there must be a finding, fairly sustained by the evidence, that in consequence of their negligence this street was not in a reasonably safe condition for use at the time of the accident. There certainly is no evidence to sustain a finding that the street was not reasonably safe for an ordinary street use. It is apparent that the police on the night of the 26th and the morning of the 27th of May had notice of the fact of this parade, and in the early morning of the 27th the officer on this beat reported to his superior officer that this bridge would be unsafe if a large crowd of people were allowed to gather on it. Thus a question as to its condition was brought to the attention of the city authorities on the morning of the 27th, and the question then comes as to whether these public

officers exercised the care of prudent persons under the existing conditions.

What were the police to do when this question was presented? They had no facilities for strengthening the bridge, and the evidence is undisputed that they at once took measures to warn the persons in charge of the bridge of the condition. Such warning was given, and the public officials had a right to rely upon the fact that reasonable means would be taken by those responsible for the bridge to prevent an accident. The police officers recognized the danger from overcrowding the bridge. They took such means as appeared to them proper to avert that danger. Police officers were placed in charge of the bridge to prevent people from gathering and standing on it, and they did all that they could do except to undertake to strengthen the bridge, for which they had no facilities, and which it would be most unjust to require them to do on such short notice. The city is responsible for a failure to take such means as were available at the time to keep this street in a safe condition; but there is nothing to show that such an unusual crowd could have been anticipated, or that the city could have done any more than it did to prevent the accident. The expert testimony offered by the defendant is at least sufficient to show that competent bridge builders considered this bridge, constructed as it was, a safe and proper bridge for the use to which it was put. The police officers who were upon the bridge regulating the traffic, and who went down with the bridge, had certainly no reason to suppose that if the crowd was kept moving there was any danger. They adopted what appeared to them to be proper precautions to protect those using the bridge, and expert and competent bridge builders have testified that the bridge was a safe and proper structure for any ordinary use to which it could be expected to be put. Could these city authorities be expected to know more than these expert and competent bridge builders? It is not fair to charge those responsible for the maintenance of this street with a knowledge that has been acquired by the accident itself, and, unless there is evidence to justify a finding that from the conditions that existed at the time the city was negligent, this verdict cannot be sustained. Taking the evidence as a whole, I am satisfied that the verdict of negligence as against the city of New York was against the weight of evidence, and that it should be set aside.

The next question presented is as to the liability of Miller and Holme; but it is quite evident that their obligation, or their duty to those lawfully using the street, was quite distinct from that of the city of New York. They had undertaken to construct a temporary bridge over an excavation in a part of the pubic street. In the construction of such a temporary bridge, it was their duty to so construct it that those lawfully using the street should be reasonably free from danger. "It is not to be expected, and cannot be required, that the temporary covering shall equal in safety and convenience the sidewalk removed, or that passengers may cross with as little heed and care as upon the completed pavement. * * * But if the builder opens his covering to the passage of the public,

although only as a temporary substitute, he must be deemed to declare it safe and free from peril to persons crossing with such ordinary prudence and care as the presence of the temporary struc- ture requires; and so he must build it with so much of care and skill and prudence as will reasonably protect the passers from peril, and enable them, with some ordinary attention to their steps, to pass it with safety." Nolan v. King, 97 N. Y. 565, 49 Am. Rep. 561. Applying this rule, I think, upon the evidence in this case, the question of the negligence of the defendants Miller and Holme was for the jury. They constructed this bridge in a public street. The bridge fell while persons were lawfully upon it, causing them injury; and, while it is true that at the time of the fall the bridge was crowded with persons who had come to view the parade on Fifth avenue, at the same time there is evidence from which the jury could find that the braces to make such a structure safe were omitted, and that it was the absence of those braces that caused the structure to fall. At the time of the accident persons were not allowed to stand upon the bridge, but were compelled by the police to keep moving. Thus the bridge was being used solely as a part of the sidewalk by pedestrians in the street, and in constructing the bridge it was the duty of the defendants Miller and Holme to so construct it that it would be reasonably safe for those using it, whether crowded or not. I think, therefore, that there was no error in the court's refusing to dismiss the complaint as to the defendants Miller and Holme.

It is also claimed by the defendants that there was no evidence to show that the plaintiff's intestate was a traveler upon the street, or that he was on the bridge at the time it collapsed. I think that there was evidence from which the jury could infer that the plaintiff's intestate was upon this bridge and was carried down by it. A policeman who was on the bridge at the time, and who was carried down with it and injured, testified that he was on the bridge from half past 1 until the time it fell; that he looked down in the excavation underneath the bridge several times, and did not at any time see any one beneath the bridge, to the west of the bridge, or at any place in the excavation; that he looked several times, but saw no one in the excavation. Officer Howard, a detective sergeant, testified that at the time the bridge fell there were 250 or 300 people on it; that about 50 went down into the excavation; that at the time of the collapse he was right back of the plaintiff's intestate, and the witness fell into the excavation; that he helped another officer carry the plaintiff's intestate on a stretcher to an office building in Eighteenth street; that the plaintiff's intestate was found in the excavation under one of the large timbers with which the bridge was constructed. And upon this evidence the jury were justified in finding that the plaintiff's intestate was upon the bridge and fell with it when it collapsed. The jury were certainly justified in finding that the deceased was free from contributory negligence if at the time of the accident he was upon the bridge and went down with it. There could be no contributory negligence in the use of this bridge under the circumstances, as

any one walking along the sidewalk, and required to use the bridge in consequence of the parade in the street, would be justified in assuming that the defendants had performed their duty and built the bridge so that it was reasonably safe for use.

There are several exceptions to rulings upon questions of evidence which are relied on by the appellants. The plaintiff produced what purported to be a model of this bridge, and called a witness who testified that he had constructed the model and as to its construction. This model represented three uprights upon which rested three needles supporting the stringers, upon which was the platform of the bridge. Another witness was called and testified that this model was a correct representation, to the best of his recollection, of the general construction work of the bridge at the time he saw it, which was before the collapse. Subsequently there was evidence tending to show that there were four uprights upon which rested needles, instead of three as shown by the model, and the evidence introduced by the plaintiff tended to show that the cause of the collapse was a lack of bracing, as it was conceded that the timber was proper for the purposes for which it was used, and none of the timber was broken. There was other evidence as to the construction of the bridge which it appears established that the model was a substantial reproduction of the bridge, with the exception of the number of uprights, and under those circumstances I do not think it was error for the court to admit the model in evidence, or to refuse to strike it out upon the motion of the defendants. There was evidence, at any rate, tending to show that this model was a correct representation of the bridge before the collapse, and, so far as that evidence was contradicted by the defendants, the question was for the jury.

The defendants also claim that the verdict was excessive. It was for $22,000. The deceased was 37 years of age, had a wife (the plaintiff) and four children, the oldest about 4½ years of age, and the youngest 3½ months, at the time of his death. One of these children has died since the trial. There is no definite evidence as to the amount the deceased earned. The plaintiff testified that she received from the deceased from $20 to $25 a week for herself and her children. I am inclined to think that this verdict is excessive. There is no evidence that the deceased had been able to save anything. His contribution for the support of his family was from $20 to $25 a week. Twenty-five dollars per week would make $1,300 a year. The jury could only award for the pecuniary injury sustained by the widow and next of kin in consequence of the death of the decedent. The income from this award would produce almost as much as the deceased contributed to the support of his family, and, assuming that the deceased would have lived 30 years, the amount awarded is much in excess of that which would be required to produce such an income as the deceased had contributed to the support of his family during that period. Under the circumstances I am inclined to think that we would not be justified in sustaining a verdict for more than $15,000.

Our conclusion is that the judgment and order appealed from,

.as against the city of New York, must be reversed and a new trial ordered, with costs to the appellant to abide the. event; and that the judgment against the defendants Miller and Holme, and the order denying new trial as to them, be reversed and a new trial ordered, with costs to the appellant to abide the event, unless the plaintiff stipulates to reduce the judgment as entered, including interest, costs, and allowance, to the sum of $17,167,11, and, upon so stipulating, the judgment and order are affirmed, without costs.

PATTERSON and HATCH, JJ., concur.

LAUGHLIN, J. I concur in the modification of the judgment, but dissent from reversal of judgment as to the city.

VAN BRUNT, P. J., dissents.on the ground that the judgments should be reversed.